COURT OF APPEALS
DECISION
DATED AND FILED

August 8, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP215-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2013CF455

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

 PLAINTIFF-RESPONDENT,

 V.

MAURICE J. HOLT,

 DEFENDANT-APPELLANT.

 APPEAL from a judgment and an order of the circuit court for Portage County:  EDWARD F. ZAPPEN, JR., and ROBERT J. SHANNON, Judges. *Affirmed*.

 Before Fitzpatrick, P.J., Blanchard and Kloppenburg, JJ.

 **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Maurice Holt appeals a judgment convicting him, following a jury trial, of armed robbery, substantial battery, battery, two counts of felony intimidation of a victim, and two counts of false imprisonment, each as a party to the crime.  He also appeals an order denying his post-conviction motion.[1] We reject each argument that Holt makes on appeal and, accordingly, affirm the judgment and order.

## BACKGROUND

¶2     The criminal complaint alleged that, late one night in September 2013, Holt, Lyndell Dale, and Archie Biddell made what began as a social visit to an apartment shared by two other men in the Village of Plover, a suburb of Stevens Point in Portage County.  But the social visit turned into an armed robbery.  At some point after Holt, Dale, and Biddell entered the apartment, the three men worked together to beat, restrain, and rob the two victims, and stole items that included a cell phone and two guitars.  We will refer to this alleged criminal conduct, collectively, as "the robbery."

¶3     About 12 hours after the robbery, the phone stolen in the robbery generated data that led police to pursue a silver Cadillac, which police approached after a high-speed chase that ended with a crash just northeast of Wausau.[2]  In the Cadillac were Dale and Biddell, but not Holt.  Also in the Cadillac were items taken in the robbery.

---

[1] The Hon. Edward Zappen ("the trial court") presided at trial.   The Hon. Robert Shannon ("the post-conviction court") denied the post-conviction motion.

[2] The drive from Plover to Wausau is approximately 42 minutes.

¶4    The complaint further alleged that an employee of a store in Wausau told police that Holt had recently come in and sold two guitars that were later identified as having been taken in the robbery. Holt told the store employee that he was selling the guitars because they had been "collecting dust." Separately, Holt's physical description matched that of the person described by the victims as the third assailant who committed the robbery with Dale and Biddell. Police executed a search warrant at Holt's residence in Wausau and found items taken in the robbery.

¶5    Further details appear in the Discussion section below, but the following are salient trial events. The jury learned that Holt's alleged confederates, Dale and Biddell, had both pled guilty to participating in the robbery. Each testified at Holt's trial. The only substantive dispute at trial was whether the State could prove that Holt was the third assailant.

¶6    The State's evidence included statements that Dale and Biddell made to police before trial in which both implicated Holt in the robbery. Both Dale and Biddell affirmed during trial testimony that they had given these statements to police, although each refused to repeat those allegations in their trial testimony and at times denied the allegations. In addition, Victim 2 testified that the third assailant told him on the night of the robbery, but before the robbery, that the third assailant was from the east side of Madison. This dovetailed with testimony at trial that Holt told police that he was from the east side of Madison and was staying in Wausau only temporarily.

¶7    Holt testified in part as follows. He was not the third assailant and he had never seen Victim 1 or Victim 2 in his life. Holt bought the stolen items from a person we will refer to as R.G.—Holt's nephew and a roommate of Holt's

at the time of the robbery. Holt lied to the music store employee, and later to police, about where he had obtained items stolen from the victims because, as a probationer, he did not want to get in trouble and was unsure where R.G. had acquired the guitars.

¶8 There were two primary defense theories. One was that R.G., not Holt, was the third robber with Dale and Biddell. This theory was supported by evidence that included testimony that the victims initially told police that "Deuce," a nickname for R.G., was the third assailant, although the victims later retracted those statements, including during their trial testimony. The other defense theory was an alibi defense: that Holt was staying with friends, Andre Kelly and Amy Kelly, the entire weekend of the robbery. However, it was also undisputed that Holt told police, two weeks after the robbery, that he spent the entire weekend at the residence he shared with the mother of his children, Lisa Ricci.

¶9 The jury convicted Holt on all counts at a three-day trial. Holt filed a post-conviction motion, seeking a new trial on the grounds that the trial court erred in excluding evidence and that his trial counsel was ineffective in multiple respects. After holding a *Machner* evidentiary hearing, the post-conviction court denied all motions in a written order.[3] Holt appeals.

---

[3] *See* ***State v. Machner***, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

## DISCUSSION

### I.   ALLEGED TRIAL COURT ERROR IN EXCLUDING EVIDENCE

¶10   Holt argues that the trial court erroneously exercised its discretion, and denied him his right to present a defense, when it rejected his request to admit evidence that he contends would have served as a basis to impeach Dale's trial testimony and would have supported the defense theory that R.G. was the third assailant.   More specifically, the court denied Holt's request to be allowed to attempt to impeach Dale with two photographs showing two masked persons, possibly armed, purportedly taken several hours before the robbery.   Holt argued that the photos would help him show that R.G. was one of the masked persons in the photos and, therefore, more likely the third assailant.   For the following reasons, we conclude that the trial court did not erroneously exercise its discretion in denying this request and that exclusion of the photographs did not deny Holt his right to present a defense.

### A.   Standards Of Review

¶11   Generally, we review a circuit court decision to admit or exclude evidence for an erroneous exercise of discretion, upholding such a ruling unless the court failed to apply the proper legal standard or the record lacks reasonable support for the ruling.   **State v. Jackson**, 2014 WI 4, ¶43, 352 Wis. 2d 249, 841 N.W.2d 791.   "However, whether the exclusion of evidence denies an accused the right to present a defense is a question of constitutional due process and is determined by this court."   **State v. Prineas**, 2012 WI App 2, ¶15, 338 Wis. 2d 362, 809 N.W.2d 68 (citing **State v. St. George**, 2002 WI 50, ¶¶16, 38, 52, 252 Wis. 2d 499, 643 N.W.2d 777).

5

**B.** **Additional Background**

¶12    We now summarize pertinent trial testimony to provide context for this issue, much of which is also pertinent to other issues addressed later in this opinion.

*Victim 1 Trial Testimony*

¶13    Victim 1 testified that, on the night *before* the night of the robbery, he and Victim 2 invited into their apartment four men: Dale, with whom the victims had gone to high school; R.G., also known as "Deuce"; and two other men. The six men hung out together until 2:00 or 3:00 a.m., with some of them smoking "a lot" of marijuana. Victim 1 had a good opportunity to observe R.G. during this time.

¶14    The robbery occurred the next night, when Dale returned to the victims' apartment for what Victim 1 thought was going to be more socializing along the same lines as the night before. This time, Dale was accompanied by two men whom Victim 1 had never seen before, neither of whom had visited the night before. Biddell was one of the two new visitors with Dale. No one was wearing a mask. Over the course of about 20 minutes, Dale, Biddell, and the third assailant committed a violent armed robbery of the two victims that including making death threats.

¶15    Victim 1 heard the voice of the third assailant, but did not get a good look at his face. The third assailant was six-feet tall and African American, with "pretty wide shoulders, [a] pretty big guy," a "buzz" hair cut. He wore all black (but maybe blue jeans), including a black hoodie.

¶16   Immediately following the robbery, while Victim 1 was still "scared" and "very shook up," he told police that the third assailant might have been "Deuce," or R.G., one of the four men who had visited the victims' apartment the evening before.  However, Victim 1 subsequently came to believe—to a level of "100 percent" certainty at the time of trial—that the third assailant was not R.G.  The third assailant did not have "the same build" as R.G.  In contrast, Holt appears to have the same build as the third assailant.  Holt was not at the victims' apartment the night before the robbery, but R.G. was.

*Victim 2 Trial Testimony*

¶17   Consistent with Victim 1's testimony, Victim 2 testified that Dale visited the victims' apartment on the night before the robbery and then again on the night of the robbery, the second time accompanied by two men who were complete strangers.  Holt was not among the men who visited the victims' apartment the night before the robbery.  Holt looked "familiar" to Victim 2, and "like" the third assailant.  However, Victim 2 could not say that he was "positive" that Holt was the third assailant.  Victim 2 might have told police after the incident that the third assailant was Deuce, but he "was really [shaken] up at the time" and was "just throwing out nicknames I'd heard in the past two days.  I wasn't really sure."

*Dale Testimony*

¶18   We now summarize pertinent testimony of Dale up to the point at which the State's direct examination ended and the trial court made the evidentiary ruling that Holt challenges.

¶19 Called by the State, Dale testified that he had been convicted in the robbery based on his plea, and at no point in his testimony did he attempt to suggest that he had not participated in the robbery. Dale acknowledged that, before trial, as part of an unwritten plea deal that was favorable to him, he had provided a detective with an honest statement that identified his two confederates in the robbery. In that honest statement, Dale told police that: (1) Dale, R.G., and two other men visited the victims' apartment on the night before the robbery, and (2) Holt was with Dale on the night of the robbery at the apartment when the robbery occurred.

¶20 However, at least at times in his testimony, Dale declined to affirmatively confirm or deny that Biddell was also present at the robbery. Further, in response to additional questioning, Dale took the position that he would not provide responsive answers. Despite the trial court's admonition that under the circumstances Dale had no right to remain silent under the Fifth Amendment, he responded to questions by remaining silent or with repeated variations on such statements as: "I'm tired of talking," "I feel like I want to leave," or "I tried to move on with my life."

¶21 Thereafter, Dale gave sometimes muddled, contradictory testimony. He alternated between confirming his earlier testimony that Holt participated in the robbery and taking that back, testifying in part that this was a lie that he had told police. In response to repeated attempts by the prosecutor to pin him down, Dale refused to take any consistent position, aside from the following two points, which he did not retreat from: that he himself had participated in the robbery and that he had given the earlier statement implicating Holt in the robbery. At one point, Dale denied that either Holt or R.G. participated in the robbery, thus

8

contradicting both the prosecution theory that Holt was the third assailant and the defense theory that R.G. was the third assailant.[4]

*Evidentiary Issue*

¶22    After the prosecutor ended his direct examination of Dale, Holt's counsel made a motion, outside the presence of the jury, for leave to cross examine Dale using "two Facebook photographs." These were two images of two masked persons. We will call these "the masked persons photos." Holt's counsel represented that the masked persons photos had been found on a Facebook page attributed to "Lyndello Delloboishootem Dale." Counsel produced hard copies of the masked persons photos for inspection by the court and the prosecutor. Hard copies are contained in the record on appeal.

¶23    The masked persons photos are low quality. Both images are dark and somewhat blurry, particularly the second. Each shows at least parts of the upper bodies of two persons, both facing the camera at close range but with both faces completely masked. In both, one masked person is dressed in black and the other is wearing a white striped shirt. In the first, the person wearing black displays what may be a handgun. In the second, the person in black may be displaying what may be the same object.

¶24    In arguing for the admission of the masked persons photos for the purpose of impeaching Dale, Holt's counsel told the court that he "believe[d]" that

---

[4] To provide context for other issues addressed below, Biddell gave trial testimony similar to that of Dale. Biddell confirmed that he himself had participated in the robbery and also that he had told a detective before trial that Holt was the third assailant, but he refused to confirm that Holt was the third assailant, at one point denying that he had ever met Holt.

Dale would testify that the individual wearing the "black sweatshirt" in the masked persons photos was R.G., that Dale was the other person, and that the photos were taken "perhaps" "five to seven hours … before the robbery." The defense argument was that, if Dale testified that R.G. was the person in black, with Dale, and that the masked persons photos were taken five to seven hours before the robbery, it would support the inference that R.G., and not Holt, participated in the robbery. In support of this argument, counsel referenced an already introduced photograph that showed R.G. wearing a black hooded shirt, which counsel appeared to contend supported a reasonable inference that R.G. was the person wearing black in the masked persons photos.[5] Defense counsel also requested the opportunity to ask Dale, outside the presence of the jury, if Dale could identify the people in the masked persons photos.

¶25     The court denied the defense motion to allow use of the masked persons photos on the ground that they lacked probative value. The court further explained that it saw no point in allowing counsel to examine Dale outside the presence of the jury about his knowledge of the masked persons photos, because the court's ruling would be the same even if Dale gave the testimony that Holt's counsel believed that Dale would give.

¶26     On this issue, the post-conviction court rejected Holt's argument based in part on earlier trial testimony in which a detective had reviewed Facebook posts associated with Dale. These posts included some photographs

---

[5] In earlier testimony, a detective had testified regarding a Facebook-posted photograph showing both victims, R.G., Dale, and Biddell (none wearing masks), taken in the victims' apartment the night before the robbery. In this photo, R.G. is wearing a black jacket, which the detective testified, based on looking at the image, might have a hood.

10

showing Dale with Biddell and others showing Dale with R.G. The post-conviction court noted that the detective had testified that, in some photographs, Dale and R.G. are shown displaying what appear to be firearms, including in one photo taken "quite near in time to" the robbery. The post-conviction court determined that Holt had already established, through the detective's testimony,

> that Dale and [R.G.] knew each other, spent time with each other, had been photographed together, that [R.G.] was wearing a black hooded jacket or sweatshirt in some of the photos and that they were photographed together brandishing guns "quite near in time" to the occurrence of the robbery. Thus, the jury was fully aware of the very evidence Mr. Holt claims he was deprived of providing them.

### C. Analysis

¶27 We assume that the trial court erroneously exercised its discretion in excluding this evidence and affirm based on harmless error, because, as the post-conviction court explained and the State essentially now advocates, even if the masked persons photos had some relevance, it was substantially outweighed by considerations of needless presentation of cumulative evidence. *See **Martindale v. Ripp**, 2001 WI 113, ¶¶30-31, 246 Wis. 2d 67, 629 N.W.2d 698 (harmless error analysis dictates whether error "affected the substantial rights of the party" under WIS. STAT. §§ 901.03 (2017-18) (Rulings on evidence) and 805.18(2) (Mistakes and Omissions; Harmless Error)); WIS. STAT. § 904.03 (relevant evidence "may be excluded if its probative value is substantially outweighed by … considerations of … needless presentation of cumulative evidence").[6] The trial court determined, reasonably we think, that there was little added value in the jury learning whatever

---

[6] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

11

Dale might have had to say about the low quality images of the two masked persons.

¶28    Explaining further, we assume that the trial court erred in excluding relevant evidence based on the court's perception that its relevance was not strong; in itself this determination should have left for the jury to decide how much weight to give this relevant evidence.  However, it is evident that the probative value of the masked persons evidence was substantially outweighed by the fact that a detective testified at trial that the detective had viewed photographs of Dale and R.G. displaying what appear to be firearms, including one photo taken "quite near in time to" the robbery, with R.G. possibly wearing a black hoodie.

¶29    Holt bases an argument on the fact that Victim 1 testified at trial that the handgun used in the robbery was "silver and black."  Holt suggests that the person wearing black in the masked persons photos displays a handgun that is "consistent" with this description.  However, Holt failed to give the trial court an opportunity to consider this consistent-gun argument at trial and we reject this argument on that basis.  *See State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995) (forfeiture rule requires that, to preserve its arguments, a party must "make all of [its] arguments to the trial court").  This court typically rejects arguments raised for the first time on appeal.  *See State v. Polashek*, 2002 WI 74, 253 Wis. 2d 527, 646 N.W.2d 330.  We see no reason to make an exception here.  Notably, the trial court would have been in the best position to determine whether a jury could reasonably find that the dim images of objects that might be handguns in the masked persons photos match the generic description, "silver and black."

12

¶30 Without clearly developing arguments along these lines, Holt suggests that he is raising issues that extend beyond a challenge to the court's evidentiary ruling. He suggests that the ruling both prevented him from presenting a defense and denied him his constitutional right to confront witnesses at trial. However, whatever Holt intends to argue along these lines, we have explained that the trial court had a valid basis to exclude the evidence, based in part on its cumulative nature, and there could be no constitutional dimension to an evidentiary argument that we reject on that ground.

## II. INEFFECTIVE ASSISTANCE

¶31 Our supreme court has summarized pertinent standards as follows:

> "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." The same right is guaranteed under Article I, Section 7 of the Wisconsin Constitution. Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact. The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo. To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial. If the defendant fails to satisfy either prong, we need not consider the other.
>
> Whether trial counsel performed deficiently is a question of law we review de novo. To establish that counsel's performance was deficient, the defendant must show that it fell below "an objective standard of reasonableness." In general, there is a strong presumption that trial counsel's conduct "falls within the wide range of reasonable professional assistance." Additionally, "[c]ounsel's decisions in choosing a trial strategy are to be given great deference."
>
> Whether any deficient performance was prejudicial is also a question of law we review de novo. To establish

13

> that deficient performance was prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*State v. Breitzman*, 2017 WI 100, ¶¶37-39, 378 Wis. 2d 431, 904 N.W.2d 93 (citations omitted).

¶32 In assessing whether trial counsel's challenged acts or omissions were reasonable, we are not limited to the strategies and explanations articulated by counsel. Rather, the question is objective: under the circumstances of the case as they existed at the time of trial, could the challenged conduct or failure to act have been justified by an attorney exercising reasonable professional judgment? *See State v. Koller*, 2001 WI App 253, ¶8, 248 Wis. 2d 259, 635 N.W.2d 838 (court "may rely on reasoning which trial counsel overlooked or even disavowed"), *modified on other grounds by State v. Schaefer*, 2003 WI App 164, 266 Wis. 2d 719, 668 N.W.2d 760.

### A. Failure To Call Britney Quade

¶33 Holt argues that trial counsel was ineffective in failing to call Britney Quade as a trial witness.[7] We resolve this issue on the ground that Holt

---

[7] We observe that Holt's brief-in-chief, no doubt inadvertently, creates unnecessary work for opposing counsel and for this court in addressing ineffective assistance issues and risks clouding the issues. He fails to address both prongs of the ineffective assistance test for each claim within its own subsection. Instead, he presents deficiency-only subsections for each claim and then a single, broad brush subsection addressing prejudice. Adding to the potential confusion, the reply brief does *not* break out deficiency and prejudice arguments into different subsections and sometimes fails to address the topic of prejudice at all.

We appreciate that prejudice arguments on multiple ineffective assistance claims sometimes overlap in significant respects. But the substance of prejudice arguments for separate
(continued)

fails to show deficient performance because there was a clear, strong strategic benefit to not calling Quade as a witness. *See **Breitzman***, 378 Wis. 2d 431, ¶38; ***Koller***, 248 Wis. 2d 259, ¶8. Accordingly, we need not address other disputes between the parties regarding the defense failure to call Quade, such as whether trial counsel knew or should have known before trial that Quade had purportedly exculpatory testimony to give or that counsel performed deficiently in failing to take adequate steps to secure her appearance through a subpoena.

¶34 The following additional background is necessary for context. Quade was not called as a witness at trial. She testified in part at the ***Machner*** hearing that Holt was sleeping on a couch in her Wausau residence at the time of the robbery in Plover. Standing alone, this obviously represented a potential alibi for Holt.

¶35 However, Holt does not dispute the State's position that the alibi testimony by Quade would have directly conflicted both with what Holt himself

claims of ineffective assistance rarely overlap completely, and at times they overlap little or not at all.

We make every effort to avoid disadvantaging Holt as a result of the briefing approach of counsel. But we strongly encourage counsel in the future to use other methods to account for overlapping arguments, such as through the use of shorthand references and cross referencing within a brief (*e.g.*, "As explained above at pp. 10-11, the defense evidence on [consistent shorthand for topic] was strong," or "As explained below at p. 20, the State presented no evidence on [consistent shorthand for topic].").

We separately observe that it is neither helpful nor appropriate for the State to make the following unsupported assertion: "Holt's cause is helped along by [trial counsel's] unseemly willingness to 'fall on his own sword,' in every respect, from beginning to end of the postconviction hearing." There was no finding by the post-conviction court that trial counsel was not credible. The State is of course entitled in circuit court ***Machner*** proceedings to closely examine trial counsel and to seek circuit court findings that trial counsel is not credible, and also entitled on appeal to provide fair characterizations of trial counsel testimony. But counsel for the State is not entitled to toss off unsupported suggestions of unprofessional conduct.

told police investigating the robbery about his whereabouts on the night of the robbery (that he was at his residence with Ricci) and also with what Holt himself and others testified at trial about his whereabouts (that he was at the Kellys' residence). Trial counsel testified at the *Machner* hearing that part of his strategy at trial was to try to persuade the jury "that my client had an alibi; was not present during the robbery nor a participant in its planning or execution." We agree with the State that, whatever Quade might have added in value to the defense, her giving the alibi testimony at trial would have risked seriously undermining a significant aspect of the defense strategy, and that not calling her was therefore well within the range of sound strategy decisions.

¶36    Holt points to separate testimony that Quade gave at the *Machner* hearing that would have inculpated R.G. as the third assailant, and argues that if trial counsel had called Quade to give this testimony, "Holt wouldn't have needed to present any alibi witnesses," eliminating any conflicts. There are at least two problems with this argument. First, it fails to account for the State's potential ability to affirmatively rebut Quade's alibi account with what Holt himself told police about his whereabouts that night, nor to account for the fact that Quade's alibi account lacks the three-witness potential force of the Kelly alibi (both Kellys and Holt testified to this). Second, Holt's argument that it was deficient performance for trial counsel not to have placed heavy weight on the shoulders of Quade is undermined by the following significant impeachment issues revealed in Quade's *Machner* hearing testimony: that she considers Holt to be "[a]lmost like he's my brother"; that at the time of the trial she had been "on the run from probation"; and that she was using methamphetamines on the night when she says Holt stayed on her couch.

16

¶37     Stepping back, Holt essentially asks us to weigh the potential costs and benefits facing the defense in attempting to prove an alibi defense in alternative ways and of attempting to prove an R.G.-as-third-assailant defense in alternative ways, which is precisely the kind of strategic judgment that we may not make after the fact in reviewing his trial counsel's performance. Based on an objective view of the circumstances facing trial counsel, counsel might have obtained some benefit through Quade's testimony on the R.G.-as-third-assailant defense but in the process sacrificed the best chance to convince jurors of an alibi.

### B.     Failure To Call Michael Hays

¶38     Holt argues that trial counsel was ineffective in failing to call Michael Hays. Hays was the driver of the Cadillac that, as noted above, was also carrying Dale and Biddell and stolen items when it crashed during the high speed chase 12 hours after the robbery. In an interview 14 months after the robbery, Hays told police that he had interacted with R.G. and Dale some hours after the robbery, in the Cadillac, shortly before the high speed chase. On this issue, we assume without deciding that it was deficient for trial counsel not to call Hays, but we conclude that Holt fails to show that there is a reasonable probability that, but for failure to call Hays, the result would have been different.

¶39     Hays did not testify at the *Machner* hearing. Holt's argument rests on a transcript of a recording of the interview police conducted with Hays. The transcript reflects Hays making statements that include the following. Hays had no direct knowledge of the robbery. Indeed, no conversations about a robbery ever occurred in his presence. Shortly before the night of the robbery, Dale told Hays that Dale and R.G. "were going to some parties in Stevens Point" and asked Hays if he wanted to join them. Hays declined this invitation. Then, between

3:00 a.m. and 6:00 a.m., which would have been between one and four hours after the robbery, Hays reached out via Facebook to Dale, and asked Dale for a ride to a hotel "right outside of Wausau," where Hays's girlfriend said she would be. Hays was then "on" "[m]eth[amphetamine] and ecstasy," and "had been up for like probably three, four days." Hays was picked up at an unspecified location by a Cadillac, with R.G. at the wheel and Dale a passenger. The three men drove to an apartment that Dale kept, where they smoked marijuana with other men who included Biddell, before at least some of this group drove to a hotel. Eventually, Hays, Dale, and Biddell left the hotel in the Cadillac and got into the high-speed police chase.

¶40    Holt argues that Hays was a "critical" potential witness "because his statements to police placed [R.G.] with Dale before the robbery, when Dale was asking Hays if he wanted to accompany them to a party near Stevens Point … [and] placed [R.G.] with Dale shortly after the robbery, driving the getaway vehicle." He contends that the jury would have acquitted Holt if it had credited Hays's potential testimony.

¶41    These arguments exaggerate the potential value of testimony from Hays. As Holt acknowledges, Hays's statement provided only indirect inferences regarding who may or may not have participated in the robbery, either as one of the three assailants or otherwise. The Cadillac was not a "getaway vehicle" for the robbery, at least not based on the Hays account. Rather, according to Hays, he had nothing to do with the robbery and heard nothing about it—despite the fact that he claimed that he extensively interacted with two of the robbery perpetrators just

hours after the robbery.[8] And, to repeat, Hays crashed the Cadillac about 12 hours after the robbery, some distance from the scene of the robbery, during a period in which Hays says that he was on methamphetamine and ecstasy and had been up for as long as four days in a row. Moreover, Hays did not suggest that Dale did anything like inviting Hays to join him and R.G. in a robbery of the victims or indicate to him in any way that Dale and R.G. had just participated in the robbery.

¶42     The communications that Hays told police he had with Dale were not necessarily at odds with the State's theory and evidence, in that the State did not dispute at trial that R.G. associated with Dale and visited the victims' apartment the night before the robbery. The jury was presented with evidence that R.G. was with Dale in the hours before the robbery. The primary added element in Hays's putative testimony would have been his alleged interaction with R.G. after the robbery. However, given the fact that Hays disavowed knowledge of actions or statements by anyone regarding the robbery, this additional allegation would not have added much to the big picture.

¶43     In sum, even assuming in Holt's favor that defense counsel could have successfully subpoenaed Hays, that Hays would have testified to the same things that he told police in the recorded interview, and that the jury would have taken at face value these statements as Hays's best recollections, Holt fails to persuade us that this testimony would have shed significant additional light on facts that mattered.

---

[8] As mentioned, Hays did not testify at the *Machner* hearing. Therefore, the post-conviction court did not have an opportunity to make a credibility determination based on testimony from Hays.

## C.     Failure To Present DNA Evidence

¶44     Holt argues that trial counsel was ineffective in failing to call an expert witness to testify that crime laboratory analysts had excluded Holt as a source of DNA found on items at the scene of the robbery.  We assume deficient performance of counsel on this topic and resolve this issue based on Holt's failure to show prejudice.

¶45     After collecting and testing Holt's DNA, crime laboratory analysts excluded Holt as the source of any DNA collected from items found at the scene of the robbery, including from a piece of toilet paper that the robbers allegedly used to try to wipe away traces of fingerprints.  No DNA evidence was presented at trial and no DNA analyst was called by either side.

¶46     In his opening statement, trial counsel stated:

> I believe you will see evidence that clearly excludes Mr. Holt as the source of any DNA discovered from this armed robbery.
>
> You will see that officers did extensive work on this case; that they collected evidence from the scene, lifted fingerprints, found DNA.  But none of that, none of that will be linked to Maurice Holt at the end of this trial.

¶47     Defense counsel concluded his closing argument by saying, "keep in mind [that] you heard testimony that DNA was taken from various items in the [victims'] apartment and no testimony that any DNA in this case matched my client."  The prosecutor began his closing argument on the same topic, saying that there was "no testimony about DNA, one way or the other."

¶48     Holt fails to develop a persuasive argument that there is a reasonable probability that the result would have been different if the jury had heard an expert

affirmatively testify that none of Holt's DNA was detected on any item recovered and tested in the investigating. As the State points out, the evidence of Holt's primary involvement in the robbery would have been consistent with him possibly leaving little detectible DNA at the scene. The defense repeatedly invited the jury, without objection, to surmise that the State was unable to make a DNA connection between Holt and the crime scene and the prosecutor did not argue that this was not the case.

### D. Failure To Offer Height Evidence

¶49 Holt argues that it was ineffective of trial counsel to fail to offer evidence at trial that, according to police reports, Holt was 5'9" (and 203 pounds), while his nephew, R.G., was 6'0" (and 195 pounds). Evidence of this alleged three-inch height difference mattered, Holt contends, because Victim 1 testified that the third assailant appeared to be 6'0" (and 210 pounds), and Victim 2 testified that the third assailant appeared to be 6'0" (and 200 pounds), and thus the victims' height descriptions matched R.G. and not Holt. We reject this argument based on a failure to show prejudice.

¶50 Holt does not persuade us that providing the jury with the reported heights of Holt and R.G. would have given the defense a meaningful advantage. The premise of Holt's argument is that, if the jury had learned that R.G. is in fact 6'0" and Holt is in fact shorter than that, it would have undermined confidence in the outcome of the trial in spite of the following testimony: Victim 1's testimony that the third assailant did not have "the same build" as R.G., and that Holt appeared to have the same build as the third assailant; Victim 2's testimony that R.G. looked younger than the third assailant. We see no reason to accept this premise. The alleged objective height difference here is not notable given that a

21

reasonable juror would understand that, at least in circumstances like this, perceived heights are at best rough estimates.

¶51     Holt points out that, among the questions and requests the jury had during deliberations, it asked, "Could we have the actual height and weight of Maurice Holt?"  The parties agreed with the trial court that it should inform the jury that there was no evidence on this point.  We do not see what the jury's question adds to the ineffective assistance analysis.  Holt does not argue that it was deficient performance for trial counsel to have failed to react to this jury question by asking the trial court to reopen evidence to allow the parties to measure anyone's height or otherwise pursue the height topic.

### E.     Failure To Offer Additional Statements Regarding R.G.

¶52     As noted above, the jury learned that the victims both initially identified R.G. as the third assailant.  The jury also heard the victims testify that they realized later that this was inaccurate.  Holt briefly asserts that it was ineffective for trial counsel to fail to present evidence of additional, initial statements of the victims identifying R.G. as the third assailant.  We agree with the State that this would have been merely cumulative evidence and that there was no deficient performance or prejudice for this reason.

### F.     Failure To Offer R.G. Facebook Messages

¶53     Holt argues that it was ineffective assistance for trial counsel not to seek to introduce three sets of text exchanges on a Facebook page maintained by R.G., purporting to reflect messages between R.G. and three other persons at three different times after the robbery, because the content of these messages suggests that R.G. was the third assailant.  The State argues that these messages would

likely have been deemed by the trial court "unauthenticated and inadmissible" for various reasons if trial counsel had tried to offer them. We conclude that Holt fails to show both deficient performance and prejudice as to any set of texts.

¶54     In response to the State's argument that these text messages would be hearsay if offered to prove that R.G. was making admissions of involvement in the robbery, *see* WIS. STAT. §§ 908.01(3), 908.02, Holt argues that they "qualify as excited utterances or statements describing his then-existing mental or emotional condition," citing WIS. STAT. § 908.03(2), (3). Holt supports this assertion merely by providing two of what he describes as examples of how these hearsay exceptions apply to portions of the second and third set of messages, which we now address.[9]

¶55     Holt's first example comes from the second set of messages. However, the second set of messages did not include excited utterances under WIS. STAT. § 908.03(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"), nor statements of a then-existing mental or emotional condition under § 908.03(3) ("A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."). This is because the

---

[9] Holt does not develop an argument that the first set of messages would have been admissible in response to the State's argument that all of the messages are hearsay. For context, we note that the first set of messages was time stamped approximately 24 hours after the robbery, and the shared tone of the messages on both sides does not on its face reflect any excitement or crisis: It starts, "Is dis Duce[?]" to which R.G. responds, "Yea wadup bro."

second set of messages was time stamped two weeks following the robbery and was casual in tone.

¶56    Holt's second example is more promising for Holt, but we conclude that it is still not sufficient to show prejudice.  It comes from the third set of messages, which were time stamped six weeks following the robbery. The other party stated that R.G. should get "on the bus" and "out of there."  R.G. allegedly responded:  "Yea I have no choice they have the dude I was with 30 years I'm not gonna sit here to get caught."  While ambiguous, this could be deemed a statement of a then-existing mental or emotional condition, and we will assume, without deciding, that the statement was admissible.  That statement may raise a reasonable inference that R.G. was fearful that he would be arrested because he was the third assailant.

¶57    On the other hand, there are at least two other reasonable inferences: six weeks after the robbery, R.G. was fearful and planning to evade police because he had played a role in the robbery that did *not* consist of being the third assailant (which would not exculpate Holt), or that R.G. was fearful that he would be falsely accused of being the third assailant or playing some other role in the robbery.  Again, the jury heard evidence that R.G. associated closely with Dale before the robbery and that stolen items were found in the residence that R.G. shared with Holt.  Therefore, it would not have been inconsistent with the State's theory at trial that R.G. was somehow involved in the robbery but without being the third assailant.  When contrasted with the positive evidence of Holt's role as the third assailant—such as the victim testimony identifying Holt as resembling the third assailant and the third assailant's "I'm from the east side of Madison"

comment—this unexplained comment of R.G. would not have reasonably counted for much.[10]   In sum, Holt does not persuade us that this ambiguous message creates a reasonable probability of a different result, one sufficient to undermine confidence in the outcome.

### G.    Failure To Offer Dale's Letter

¶58    Holt argues that it was ineffective for trial counsel to fail to introduce at trial a letter purportedly from Dale to R.G., because it would have provided impeachment material for cross examination of Dale, showing that Dale "concocted" his identification of Holt as the third assailant in his statement to police.  We need not provide detailed factual background, because this argument is meritless on its face.  Holt fails to make a meaningful case for deficiency or prejudice.

¶59    Even assuming that trial counsel should have understood that a jury would agree with how Holt now translates the highly ambiguous letter into more intelligible language, as the State points out trial counsel could reasonably have understood this translated version to have carried as much danger of *inculpating* Holt as it carried the possibility of *exculpating* him.  One reasonable interpretation is that it was an attempt to encourage a potential witness to falsely put the robbery handgun into the hands of Holt, as opposed to into the hands of either Dale or Biddell.  In addition, Holt's translation may be interpreted as an explanation of the robbery by a participant being addressed to R.G. as someone who only came to

---

[10] Holt does not suggest that trial counsel had available evidence that R.G., like Holt, was from the east side of Madison.

learn about the robbery after the fact, not from direct involvement in the robbery as the third assailant.

### H.    Failure To Strike Dale's Testimony

¶60    Holt makes an argument that changes shape between his opening brief and his reply brief, but ends up being the following:  it was ineffective for trial counsel to have failed to move to strike Dale's trial testimony in its entirety because Dale never identified the third assailant in his trial testimony.  This is significant, Holt contends, because if the trial court had stricken all of Dale's testimony the result would have been that all of Dale's statements, including his pre-trial statements implicating Holt as the third assailant, "would have been rendered inadmissible."  However, Holt fails to provide a basis for us to conclude that, if trial counsel had made such a motion, the court would have exercised its discretion to strike all of Dale's testimony.

¶61    A circuit court may exercise its discretion to strike testimony of a witness who refuses to answer certain questions on cross examination.  *See* ***State v. Monsoor***, 56 Wis. 2d 689, 698-703, 203 N.W.2d 20 (1973).  Our supreme court has emphasized that this is a discretionary decision of the circuit court, which is in the best position to evaluate pertinent circumstances.  ***Id.*** at 701-02.

¶62    We question various aspects of Holt's argument, but it is sufficient to observe that, as noted above, Dale *did* provide testimony confirming that Holt was the third assailant and then separately denied that this was true.  The fact that Dale sometimes refused to answer questions and sometimes gave muddled testimony does not change the fact he made the prior inconsistent statements about Holt's alleged role as the third assailant that goes to the heart of the dispute at trial.  Thus, trial counsel lacked a basis to argue that all of Dale's testimony should be

stricken because Dale refused to testify on this topic. Holt presents us with no reason to conclude that the trial court, if presented with a motion to strike Dale's entire testimony, would not have decided that contradictions in Dale's testimony presented interpretation and credibility issues for jurors to sort out, crediting or rejecting pertinent parts of Dale's testimony. It is the routine work of juries to process balks and contradictions in witness testimony.

## I.    Failure To Object To Reference To Holt As Drug Dealer

¶63    Holt briefly asserts that it was ineffective for trial counsel not to object to a somewhat confusing reference made in trial testimony by the detective who took Dale's pretrial statement, to the effect that Dale had told the detective that one motivation for the robbery could have been a "story about [Victim 2] allegedly robbing one of Holt's dealers, drug dealers." Holt fails to develop a supported argument that this reference could have been significant to jurors and we reject the argument on that basis.

¶64    It is difficult to determine from the transcript how jurors might have understood what the detective intended to convey in making a passing reference to this "story." And, Holt does not purport to shed any light on how the jury would likely have processed it, for example in light of other evidence or any argument made by either side at trial. Notably, it does not appear that the detective could have been reasonably understood to mean that the detective himself had a basis to believe that Holt supervised drug dealers, even if Dale had related to the detective a "story" to this effect. Holt does not dispute the State's assertion that the State made no use of the detective's "drug dealers" reference during trial.

### J.     Opening The Door To Other Acts Evidence

¶65     Holt argues that trial counsel was ineffective when he "opened the door to damaging other-acts" in his questioning of a witness, Lisa Ricci, with whom Holt shared children and generally resided at the time of the robbery. We reject this argument on the ground that he fails to show deficient performance.

¶66     This argument requires the following additional background regarding Holt's alibi defense. The defense called Ricci as a witness. Ricci testified in pertinent part that she and Holt lived together during the period at issue, but that he left home for the entire weekend over which the robbery took place, because the two were fighting. The defense intended for Ricci's testimony to dovetail with the separate alibi testimony referenced above, namely, that of Andre Kelly, a friend of Holt, and his wife, Amy Kelly. The Kellys and Holt all testified that Holt spent that entire weekend at the Kellys' home.

¶67     With that additional background, Holt's argument depends in part on the proposition that it was deficient performance for trial counsel to have asked Ricci: "So, why were you [Ricci and Holt] fighting?" Ricci responded that Holt was having trouble finding employment and that their family finances were difficult. Before cross examining Ricci, out of the presence of the jury, the State sought a ruling from the court that the State could attempt to impeach Ricci, based on separate pretrial statements she had made. The State argued that pretrial statements she had made suggested that her answer to the defense counsel's why-were-you-fighting question had been incomplete, because the couple had in fact been fighting in part over her concern that Holt had been engaging in burglaries and robberies. The court allowed this questioning, resulting in Ricci testifying that

28

she had heard rumors about Holt committing robberies and she was worried that this might lead police to "raid" their residence.[11]

¶68 We agree with the State that, "So, why were you fighting?" was a reasonable question for trial counsel to ask in order to give content to the alibi defense. This question was part and parcel of the strategy to pursue an alibi defense that carried a possible danger (depending on how Ricci testified) that the State would seek, and the court would allow, impeachment of Ricci through a demand for a *complete* answer to the question. And, Holt fails to develop an argument that it was ineffective assistance, in light of this possible danger, to pursue the alibi defense that he was with the Kellys—and not home with Ricci, as Holt told police—all of that weekend.

### K. Failure To Object To Improper Argument

¶69 Holt argues that it was ineffective assistance for trial counsel to fail to object when the prosecutor inaccurately or without an evidentiary basis argued to the jury that alibi witness Andre Kelly had no criminal convictions. We reject this argument based on Holt's failure to show prejudice. The topic of Andre Kelly's convictions arose in connection with the defense explanation for why neither Holt nor Kelly told police during the investigation that Holt had been at Kelly's residence over the weekend of the robbery. The explanation was that the two were both on probation and were not permitted to have contact. Holt briefly

---

[11] Holt's door-opening ineffective assistance argument is narrowly focused on the decision of trial counsel to ask Ricci, on direct examination, "So, why were you fighting?" Holt does not challenge the substance of the trial court's discretionary evidentiary decision to allow the State to question Ricci about whether the fight between the two partly involved her concern that he was engaging in burglaries and robberies, nor does Holt challenge any aspect of the State's cross examination of Ricci.

asserts, by way of a prejudice argument, that there is "a substantial danger the jury disbelieved Holt's alibi witnesses," in part because of the prosecutor's comments. However, Holt fails to develop a clear argument and also fails to respond to the State's argument, supported by reference to evidence presented at trial, that the jury had a strong basis to disbelieve the alibi defense unrelated to the conviction-probation issue, conceding the point. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (failure to refute proposition asserted in response brief may be taken as concession).

### L. Failure To Request Cautionary Instructions

¶70   When Holt testified, the State sought to impeach him by having him acknowledge that he had 14 prior criminal convictions, in the manner contemplated under WIS. STAT. § 906.09 (impeachment of defendant's testimony based on prior convictions).   Holt now argues that it was ineffective for trial counsel to fail to request that the trial court give WIS JI—CRIMINAL 327 to limit the effect of this information.[12]   In addition, the jury heard the following:  as discussed above, a detective made a reference to a "story" about Holt supervising drug dealers; as separately discussed above, Ricci related that there were rumors that Holt was engaged in burglaries or robberies; and Holt testified that he was

---

[12] WISCONSIN JI—CRIMINAL 327 states:

> Evidence has been received that the defendant (name) has been [convicted of crime(s)] [adjudicated delinquent].  This evidence was received solely because it bears upon the defendant's character for truthfulness as a witness.  It must not be used for any other purpose, and, particularly, you should bear in mind that a [criminal conviction] [juvenile adjudication] at some previous time is not proof of guilt of the offense now charged.

prohibited from contact with Kelly because both were on probation. Holt now argues that it was ineffective of trial counsel to fail to request that the court give WIS JI—CRIMINAL 275, which addresses the manner in which jurors should consider evidence presented regarding "other acts," conduct of the defendant for which the defendant is not on trial.

¶71    On these topics, Holt merely asserts prejudice in an entirely conclusory manner, and has no reply on this topic after the State makes several, supported lack-of-prejudice arguments. We resolve this issue on that basis. *See id.*

### M.    Failure To Request Alibi Instruction

¶72    In another alibi-related argument, Holt briefly contends that it was ineffective assistance for trial counsel to fail to request WIS JI—CRIMINAL 775, which states:

> There is evidence in this case that at the time of the commission of the offense charged, the defendant was at a place other than that where the crime occurred.
>
> It is not necessary for the defendant to establish that he was not present at the scene of the crime or that he was at some other place. The burden is upon the State to convince you beyond a reasonable doubt that the defendant committed the offense as charged.

We conclude that Holt has failed to show prejudice from failure of the jury to receive this instruction.

¶73    The State contends that there was no prejudice, given the following: the jury was properly instructed that the State was obligated to convince the jury beyond a reasonable doubt that the defendant committed every element of each offense (effectively covering the essence of WIS JI—CRIMINAL 775); and neither

31

side, nor the trial court, nor any witness, in the words of the post-conviction court, "inferred that it was Mr. Holt's burden or responsibility to offer evidence of an alibi nor in any other way made any misstatement of the law concerning his alibi defense."

¶74     Holt relies on non-controlling authority for the proposition that a special alibi instruction should generally be given whenever a defendant offers an alibi defense to ensure that jurors do not find a defendant guilty simply because the defense has failed to prove the alibi, which would improperly ignore the burden of proof that remains with the State regardless of how the jury assesses proof of the alibi. *See, e.g.*, **United States v. Burse**, 531 F.2d 1151, 1152-53 (2d Cir. 1976) ("As a general rule, we think it best for [alibi] instructions to be given where alibi is claimed."). However, Holt fails to cite Wisconsin authority on this topic. He also fails to challenge the post-conviction court's position that the record reflects no suggestion to jurors that they should ignore the instruction requiring them to hold the State to its burden of proof if they disbelieved the alibi. Holt gives us no reason to conclude that jurors here did not properly understand that alibi evidence could prevent the State from meeting its burden of proof (*i.e.*, understand that reasonable doubt about Holt's presence at the scene of the crimes must result in not guilty verdicts), and also properly understand that, even if the alibi evidence was weak or incredible, the State would still have to meet its burden to affirmatively prove each element of each charged offense.

### N.     Cumulative Effective Of Alleged Acts Of Deficient Performance

¶75     Holt appears to intend to argue that the cumulative effect of all deficient performance of trial counsel was prejudicial, even if we conclude that

32

only some performance was deficient or conclude that some deficient performance was not prejudicial. We reject any such argument.

¶76 We would not characterize the State's case as overwhelming, in the absence of a confession by Holt or physical evidence tying him to the robbery aside from the stolen items he possessed, some of which he sold shortly after the robbery. But, in addition to Holt's sale of the stolen items, the State's evidence included the following strong categories of evidence: the only slightly qualified identification by Victim 2 and the body-type identification by Victim 1, with both victims unambiguously rejecting the suggestion that it was R.G. and not Holt who was the third assailant; the third assailant's admission to being from east Madison, which matches Holt but not R.G.; and the incriminating pretrial statements of both Dale and Biddell, which they wholly or in part denied at trial, but without providing robust explanations for why they would have falsely implicated Holt when questioned by police. The jury was able to weigh evidence in support of the defense that R.G. was the third assailant, but this defense was seriously undermined by all three of these categories of incriminating evidence. Similarly, the jury was able to consider the defense that Holt was staying with his friend Kelly all weekend of the robbery, but that defense was seriously undermined by Holt's own statement to police that he was at home that weekend. Weighed against this background, the deficiencies that Holt now attributes to trial counsel appear to us to be inconsequential both individually and collectively.[13]

---

[13] Holt contends, based on the arguments we have addressed above, that he received a "legitimately disastrous" trial, and therefore we should exercise our discretionary authority under WIS. STAT. § 752.35 to order a new trial in the interest of justice. For the reasons we have explained, we conclude that Holt fails to prove that the real controversy was not fully tried.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.